IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF TARGET DEVICES CURRENTLY LOCATED AT HSI BALTIMORE, 40 SOUTH GAY STREET, BALTIMORE, MARYLAND 21202 | Case No. 19-1835TJS |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A SEARCH WARRANT

I, Special Agent August Merker, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—cellular telephones—which are currently in law enforcement possession, and the extraction from that property of electronically stored information more fully described in Attachment B.

2. I am a Special Agent with the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been so employed since May 2003. I am assigned to the Office of the Special Agent in Charge, Baltimore, Maryland. I have prepared and executed numerous state and federal search warrants and assisted with Title III court-authorized intercepts. Further, I have gathered evidence of violations of both state and federal laws, interviewed numerous suspects, witnesses and informants, and have participated in the execution of search and arrest warrants in connection with the aforementioned investigations. I am currently assigned to the Counter-Proliferation Investigations Task Force, where I am responsible for conducting criminal investigations involving the illegal exportation of goods and services from the United States as well as

1

associated money laundering violations in the District of Maryland. Prior to my appointment with HSI, I served five years as a Police Officer in Montgomery County, Maryland.

3. In my experience, individuals utilize cellular phones and computers for multiple purposes aside from making telephone calls, such as utilizing them as storage devices. Cellular phones allow individuals to store a large amount of electronic evidence to include: graphic images, video files, audio files, text messages, emails, multimedia messages, contacts, call history and electronic files. My training and experience, as well as that of other law enforcement officers has shown that criminals often use cellular telephones and computers to communicate regarding their criminal activity, with other criminals, to store information, and to document their crimes.

4. Your affiant knows that individuals, who are involved fraud scams and conspiracy to commit fraud, use cellular telephones and computers to facilitate the fraud with other members of the organization. Your affiant also knows that individuals involved in criminal activity, including fraud matters, often use encrypted applications, like WhatsApp, on their cellular telephones and other electronic devices to avoid detection. Your affiant knows that organizations and individuals who are involved in fraud scams and conspiracy to commit fraud, use may use tablets to conduct various business transactions in place of a computer. These are typically used to perform business transactions, respond to emails, and conduct banking transactions.

5. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—cellular telephones described herein and in Attachment A (collectively, the "**TARGET**

**DEVICES"**), and the extraction from that property of electronically stored information more fully described in Attachment B.

6. This affidavit does not contain every fact known to me regarding this investigation, but rather contains information necessary to demonstrate probable cause in support of the above-referenced search warrant. The facts and information contained in this affidavit are based on my personal knowledge and information obtained from federal and state law enforcement officers. All observations referenced in this affidavit that I did not personally make were relayed to me by the person(s) who made such observations or in reports that detailed the events described by that person(s).

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

As listed in Attachment A, the **TARGET DEVICES** to be searched are:

(a) **TARGET DEVICE 1**: iPhone cellular telephone, Serial Number: F735P55YHG75, IMEI: 355310083681787; and

(b) **TARGET DEVICE 2**: iPhone cellular telephone, IMEI 013554001013219.

The **TARGET DEVICES** are currently in law enforcement's possession at 40 South Gay Street, Baltimore, Maryland 21202.

7. In my training and experience, I know that the **TARGET DEVICES** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET DEVICES** first came into the possession of law enforcement.

8. The **TARGET DEVICES** were detained during a border search and arrest of Eucharia NJOKU when she returned to the United States from China on or about March 25, 2019. Even though HSI had the necessary authority to examine the **TARGET DEVICES** pursuant to the border search, I seek this warrant out of an abundance of caution to be certain

3

that an examination of the **TARGET DEVICES** will comply with the Fourth Amendment and other applicable laws.

9.  On September 12, 2018, a federal grand jury for the District of Maryland returned a sixteen-count Indictment charging Peter UNAKALU, Khalid RAZAQ, Janet STURMER, Brandon ROSS, Saulina EADY, Saul EADY, Eunice NKONGHO, and Troy BARBOUR with various federal crimes, including mail fraud, wire fraud, money laundering, aggravated identity theft, and interstate transportation of stolen property. On March 20, 2019, a federal grand jury for the District of Maryland returned a four-count Indictment charging NJOKU with conspiracy to commit mail and wire fraud, money laundering conspiracy, mail fraud, and interstate transportation of stolen property.

10. The applied-for warrant would authorize the forensic examination of the **TARGET DEVICES** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

11. The owner and user of the **TARGET DEVICES**—NJOKU—is engaged in a conspiracy to illegally obtain export controlled military communications equipment and high-end consumer electronics equipment through various forms of fraud and trafficking in counterfeit goods. During the course of this investigation, as further described below, these individuals (including at least UNAKALU, RAZAQ, ROSS, Saul EADY, and NKONGHO) have engaged in criminal activity to further the conspiracy using wireless communication/cellular telephones.

**A.   Fraud Scheme Perpetuated by Drunz Organization**

12. Beginning in approximately December 2016, law enforcement began investigating a scheme that involved numerous coconspirators engaged in large-scale mail fraud

4

to obtain goods sent to various points throughout the United States. To perpetuate the fraud scheme, the organization used falsified U.S. military email accounts (i.e., Daniel.Drunz@navy-mil.us) and contracting documents to obtain products such as high-end consumer products and export-controlled military communications equipment. This equipment included approximately $6.3 million in LG televisions, at least $3.2 million in sensitive export-controlled communications equipment, and approximately $1.1 million in iPhones and iPads. Beginning in or about October 2016, the above email account was used to defraud three companies, two in Virginia (hereinafter "Company A" and Company C) and one in Maryland (hereinafter "Company B"). Company B is a Cleared Defense Contractor who develops and produces highly sensitive export-controlled communications equipment for the United States government. The investigation revealed that the items procured from these companies were sent to a warehouse located in Chantilly, Virginia and then ultimately shipped to the area of Los Angeles, California.

13. On or about August 31, 2016, Company A, that distributes LG televisions and equipment, received an email regarding a business opportunity with an individual who identified himself as Daniel DRUNZ ("DRUNZ"). DRUNZ stated that he was a U.S. Navy contracting officer and sought to purchase 1,596 LG OLED television/monitor units from Company A, using what appeared to be electronic copies of official U.S. Navy procurement and acquisition documents containing contract number N66001-16-D-0178. On or about October 12, 2016, Company A received via email what appeared to be a U.S. Navy contract from DRUNZ for 2,394 LG OLED television/monitor units to be delivered to what DRUNZ claimed was a warehouse owned by the U.S. Navy and located at 4116A Walney Road, Chantilly, Virginia 20151, in exchange for approximately $7,166,255.46.

14. Subsequent investigation has shown that the order placed by DRUNZ was

5

fraudulent. Records searches for DRUNZ revealed that there has never been a U.S. Navy employee named Daniel DRUNZ. A search of Department of Defense databases revealed that contract number N66001-16-D-0178 never existed. Checks with the management company show that the office located at 4116A Walney Road, Chantilly, Virginia, was not rented by the U.S. Navy but instead was rented by an individual fitting the description of Janet STURMER, a co-conspirator and member of the organization, who identified herself as with the company "Paes Enterprises." On or about October 31, 2016, November 1, 2016, and November 8, 2016, numerous tractor-trailers arrived at 4116A Walney Road, Chantilly, Virginia, to deliver approximately 2,019 LG Electronics televisions/monitors valued at approximately $6,352,048.20. According to witnesses, crews of workers met the tractor-trailers and off-loaded the televisions/monitors into the storefront during the day. These witnesses also recounted that subsequently, the televisions/monitors were loaded into U-Haul and Budget Rental trucks that were then driven away from the 4116A Walney Road location.

15. After delivering the LG televisions/monitors, Company A attempted to receive payment from the U.S. Navy for the televisions/monitors. Company A sent a request for payment to the Defense Finance and Accounting Service ("DFAS"), an agency of the Department of Defense ("DOD") that provides payment to DOD contractors and vendors. DFAS notified Company A on or about December 29, 2016 that the contract DRUNZ had provided was not a valid U.S. Navy contract. To date, Company A has not received any payment from DRUNZ for the televisions/monitors.

16. On or about December 5, 2016, law enforcement met with Company B. During this meeting, representatives from Company B informed law enforcement that Company B had been contacted by an individual using the name DRUNZ in or about August 2016.

17. DRUNZ contacted Company B using the email address Daniel.Drunz@navy-mil.us and identified himself as a U.S. Navy contracting official. Beginning in or about August 2016, DRUNZ provided Company B with documents that DRUNZ represented were a U.S. Navy contract bearing contract number N65236-16-D-0093. This contract called for Company B to sell DRUNZ highly sensitive communications interception equipment listed on the United States Munitions List ("USML") and therefore controlled for export under the International Trafficking in Arms Regulations ("ITAR"). Specifically, according to Company B, many of these commodities are controlled under the USML Category XI. Multiple items that were acquired by this criminal organization via the fraud scheme are so highly restricted that, according to Company B, even a photograph of the item is considered controlled under the ITAR as their existence is not public knowledge.

18. The "Ship to Address" provided to Company B by DRUNZ on the contract was 4116A Walney Road, Chantilly, Virginia, which DRUNZ represented to be a U.S. Navy facility. On or about October 27, 2016, Company B sent the products listed in the contract provided by DRUNZ, which were valued at approximately $3,200,000, to the final delivery address located in Chantilly, Virginia.

19. Records searches for DRUNZ revealed that there has never been a U.S. Navy employee named Daniel DRUNZ. A search of DOD databases revealed that contract number N65236-16-D-0093 does not exist. Company B has received no payment for the items it shipped pursuant to the contract provided by DRUNZ.

**B.  Prior Cellular Communications and Electronic Device Search Warrant Results**

    **i.  Eucharia NJOKU and the TARGET DEVICES**

20. On March 20, 2017, NKONGHO flew from Havana, Cuba to Miami, Florida.

Customs and Border Protection ("CBP") officers inspected NKONGHO on her way into the United States. NKONGHO had multiple devices seized pursuant to a border search to include a cellphone. On March 29, 2017, law enforcement obtained a federal search warrant from U.S. District Court for the District of Maryland granting the examination of these devices by law enforcement (Case Number TMD 17-0941).

21. During the examination of the cellphone, law enforcement confirmed the familial relationship between NKONGHO and Peter UNAKALU, namely that they were husband and wife. Additionally, law enforcement discovered multiple conversations between NKONGHO and UNAKALU discussing the transfer of money between NKONGHO and Khalid RAZAQ for the payment and further facilitation of the fraud scheme. For example, on or about November 14, 2016, UNAKALU contacted NKONGHO and directed her to send RAZAQ $5,000 so that he can "ship product." During this conversation, UNAKALU sent RAZAQ a picture of the bank account information for RAZAQ and indicated that this bank was where NKONGHO was to transfer the money. Shortly after, NKONGHO responded to UNAKALU by sending a picture of the bank confirmation showing the money has been transferred. These communications occurred over the WhatsApp messaging service.

22. On September 17, 2017, NJOKU, the alleged distributor of the fraudulently acquired property, flew from China to California. CBP Officers inspected NJOKU upon entry into the United States and seized multiple devices to include a cellphone pursuant to a border search. On November 9, 2017, law enforcement obtained a federal search warrant from the United States District Court for the District of Maryland granting the examination of these devices by law enforcement (Case Number TMD 17-3082).

23. Within NKONGHO's cellphone, law enforcement reviewed numerous

conversations between NKONGHO and NJOKU, which revealed a close relationship not only between the NKONGHO and NJOKU but also between NJOKU and UNAKALU. Multiple conversations between NKONGHO and NJOKU further indicated a business relationship between NJOKU and UNAKALU. The communications between NKONGHO and NJOKU revealed that NKONGHO acted on behalf of UNAKALU in the United States. Of note, UNAKALU cannot travel to the United States due his prior deportations for both immigration and criminal fraud violations (U.S. District Court for the District of Delaware, Criminal Number: 92-55-1). These communications occurred over WhatsApp messaging service.

24. On multiple occasions from approximately July 2015 through July 2018, as evidenced from the review of the above cellphone conversations, NJOKU sent messages via WhatsApp to NKONGHO requesting that she notify UNAKALU that he needed to contact NJOKU. On or about February 18, 2017, NKONGHO contacted NJOKU via WhatsApp and stated: "Good Morning. Hubby said I collect 2k from u. thanks." Approximately one hour later, NJOKU responded "Ok." As another example, on or about February 20, 2017, NJOKU contacted NKONGHO via WhatsApp and stated: "Hello dear tell your hubby to please bring a big bag when he is coming to meet us." NKONGHO responded with the following: "Ok. He want to know which name u are using on ur passport so he can have his friend that work with custom to clear you gusy faster from the airport." In response, NJOKU messaged: "Eucharia. Njoku."

25. NJOKU's cellphone also contained a large number of emails and WhatsApp messages that NJOKU exchanged with brokers in China dealing with designer purses and shoes. On March 8, 2018, NJOKU communicates via WhatsApp with a subject using the phone number (310) 990-5118 (the subject is interested in buying high-end purses "Hermes Birkin"). NJOKU

9

stated that the purses cost $850.00 each and then asked the subject what kind of leather she wants on the purse. Open source information indicates that these purses retail for between $7,000 and $30,000. The message is then followed by several pictures of Hermes purses. Law enforcement knows that individuals that deal in counterfeit commodities will often exchange photos of counterfeit commodities that will be bought and sold.

26. On or about October 4, 2018, NJOKU flew from Zurich, Switzerland on Swiss Air Flight 40 to Los Angeles International Airport, California. When NJOKU entered the United Statesa, law enforcement interviewed NJOKU about her involvement in the Drunz Organization. During the interview, NJOKU admitted to knowing NKONGHO and UNAKALU. NJOKU was asked specifically about iPhones and iPads that she received from a coconspirator, and NJOKU stated that she did not know what happened to "the stolen goods." At no time during the interview did law enforcement tell NJOKU that the iPhones and iPads had been stolen. As previously explained, the organization fraudulently obtained these Apple products from Company C using the above noted fraud scheme.

27. On or about October 4, 2018 (the same day), while at the airport, law enforcement performed a border search of NJOKU's carryon bag and checked luggage. During this search, law enforcement removed four purses that appeared to be counterfeit. Law enforcement had the bags checked by a CBP subject matter expert who stated that the purses did not have the proper zippers and that the color of the purses was not consist with genuine designer purses. On or about January 17, 2019, the Customs and Border Protection National Intellectual Property Rights Coordination Center determined that the four purses were counterfeit.

**Arrest and Border Search of NJOKU**

28. Following the return of the grand jury indictment and the federal arrest warrant,

on or about March 25, 2018, law enforcement arrested NJOKU was arrested upon her return to the United States at Los Angeles International Airport. At the time of her arrest, NJOKU had the **TARGET DEVICES** in her possession. Law enforcement also discovered that NJOKU had in her possession a Rolex watch, which LAX CBP officers determined to be counterfeit. The watch will be sent to National Intellectual Property Rights Coordination Center for review.

29. Based on my training, experience, and knowledge of this investigation, I believe that based upon the pattern of communications and the close nature of the relationship between NKONGHO, NJOKU, and UNAKALU, that communications continued up until the time the **TARGET DEVICES** were detained and are likely ongoing through other electronic devices. I believe that the **TARGET DEVICES** likely contain communications such as the communications made on other devices, as recently as July 2018. I also believe that the **TARGET DEVICES** may also contain evidence related to the acquisition, transport, and distribution of stolen and counterfeit goods in relation to the above noted fraud schemes since similar commutations dealing with counterfeit goods have previously been found on NJOKU's electronic media.

## TECHNICAL TERMS

30. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and

storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive email. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

c. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

d. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

31. Based on my training, experience, and research, I know that the **TARGET DEVICES** have capabilities that allow it to serve as a wireless telephone, PDA, Tablet, Computer, and use and IP address in connection with the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

32. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

33. There is probable cause to believe that things that were once stored on the **TARGET DEVICES** may still be stored there, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer

13

users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

34. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual

    information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

35. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

36. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

37. Your affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET DEVICES** further described in Attachment A to seek the items and information described in Attachment B.

                      Respectfully submitted,

                      _____
                      August Merker, Special Agent
                      Homeland Security Investigations

SUBSCRIBED and SWORN to before me this 23 day of May 2019.

_____
Honorable Timothy J. Sullivan
United States Magistrate Judge

15